Durpee, Judge,
delivered the opinion of the court:
This is an action for delay damages and added engineering costs not compensable under the changes clause or any modification to the contract in issue. North American Philips Company, Inc., the nominal plaintiff, and Philips Electronics, Inc., a sister corporation, are both referred to interchangeably as plaintiff. North American Philips Company has no present interest in the outcome of the present suit, the real party in interest being the transferee of North American’s interest in the contract — Philips Electronics.
This case is before the court on a Congressional reference. It is also one within the general jurisdiction of the court. It is therefore one on which, under 28 U.S.C. § 1492 (1964 ed.) the court may render judgment.
*73 In 1952 defendant entered into a contract with A.K.F. Products, Inc. (hereinafter AKF) for development and production of signal generators.[1] Under this contract AKF was additionally required to furnish a complete set of finished production drawings from which copies could be made for future procurements. By November, 1954, defendant determined the need for procurement of additional signal generators; however, AKF had not yet completed work on the development and production contract, and therefore, the production drawings for the generators had not yet been completed. Despite the absence of production drawings for the signal generators, the authorized engineer representative of defendant decided to proceed with the procurement and instituted bid procedures. Bid invitations were then issued on January 18, 1955. These invitations contained a statement that drawings were not available.
Between issuance of bid invitations and submission of plaintiff’s bid on February 18, 1955, defendant had on display at Fort Monmouth a model of the signal generator, and had representatives there to give advice and information to bidders. The model was assembled and it was not possible to make a detailed examination of its components without disassembly, which was not permitted. Also available for examination by bidders were specifications and a copy of the Army Technical Manual containing descriptive data, pictures, diagrams, and a probably inaccurate and incomplete parts list of the signal generator. Kepresentatives of plaintiff spent a day at Fort Monmouth obtaining the information relevant to the procurement. On that occasion they were also told that, although it was not then known when AKF would deliver its production drawings to the Government, the drawings, when available, would be furnished the successful bidder for the pending new procurement.
Hindsight shows that the information which was available to plaintiff and the other bidders at Fort Monmouth was sufficient to make only an inexact estimate of costs for bid purposes. Examination of production drawings and disas-sembly of the display model would have been necessary for *74 a more accurate estimate of costs. It is customary and desirable in comparable procurements to furnish production drawings to bidders, but it is also not uncommon in procurement of equipment of complexity comparable to a signal generator that production drawings are not furnished bidders because they are not available as in this instance. Hindsight again shows a substantial risk involved in plaintiff submitting the bid under these circumstances; however at least 26 other firms besides plaintiff submitted bids in this particular procurement, thus alleviating to a large extent the question as to plaintiff’s wisdom in taking a chance on misjudgment.
Plaintiff’s bid of $644 per unit was the lowest responsive bid. In addition to the signal generators, plaintiff was to supply a set of reproducible Vandykes of manufacturer’s own drawings[2] and about 44 production drawings for the case and dummy load, accessories to the signal generator. The bid estimate provided $15,000 in engineering costs and $5,000 for the drawings, of which $185 was for the Vandykes. The contract was awarded plaintiff on May 20,1955 to deliver 652 signal generators plus accessories and drawings. In June 1955 the quantity was increased by 355 units at a reduced price of $619 each. The units were to be delivered in installments from March through October, 1956, with the schedule later revised to commence in August 1956 and to be completed March, 1957. The contract specifications stated that unless otherwise specified, all components of the signal generator “shall conform to the model,” and further that “where drawings or a model are supplied to the contractor for his guidance, * * * this specification and any specification to which it is subsidiary shall govern over the drawings or model.”
A brief summary of what has transpired is now in order so that the events that followed may be seen perspectively. *75 In summarizing these events, we shall also look at the parties’ intent as it must be remembered that “in the ease of contracts the avowed purpose and primary function of the court is the ascertainment of the intention of the parties.” Williston on Contracts, Third Edition, section 601; Union Pacific Railroad Co. v. United States, 10 Ct. Cl. 548 (1874), aff'd United States v. Union Pacific Railroad Co., 11 Ct. Cl. 1, 91 U.S. 72 (1875); Chase and Rice, Inc. v. United States, 173 Ct. Cl. 740, 354 F. 2d 318 (December 1965).
Plaintiff had compiled its bid based on a copy of the specifications, the descriptive data in the Army Technical Manual, an inspection of an assembled model, and an incomplete parts list. Plaintiff knew that the ARF drawings were not available for bid purposes, but had been assured that when they were available, they would be furnished as an aid in the manufacture of the signal generators. Plaintiff also knew that the ARF drawings were being made from a prior procurement of the signal generator and undoubtedly expected the drawings when delivered to be capable of use in production. Plaintiff, therefore, took a risk in underestimating the cost of materials (materials not called for in information available) for completion of the signal generator by bidding without seeing production drawings and the disassembled model; however, plaintiff believed that any production drawings received would be complete and workable, supplying any omissions, and also helpful in assembly. Plaintiff could not have relied on any more help from the drawings than that stated above since the specifications in the invitation and the resulting contract both stated that the completed item “shall conform to the model,” and that the specifications governed over the drawings or model.
Defendant also must have expected the completed drawings from ARF to be suitable for procurement purposes, and helpful to the successful bidder in supplying omissions and in assembling the item. This conclusion is based on two facts — first, research and development, and development and production contracts had been given to ARF to originally procure the signal generators, and the procurement had been successfully accomplished and, second, the pro *76 duction drawings required from plaintiff under the contract related only to generator accessories, not to the actual item itself, thus implying confidence that ARF would supply complete drawings for the generator.
Keeping the above analysis in mind, we return to the subsequent events of this controversy. The ARF production drawings were delivered to defendant on April 27, 1955. Defendant reviewed and approved them on May 16, 1955, four days prior to the award of the contract in suit to plaintiff. However, they were not checked by the Government to determine whether they accurately reflected the ARF signal generator, and defendant advised plaintiff that it was uncertain of the accuracy of the drawings. The availability of these ARF drawings obviated the need for the drawings plaintiff was to supply with its contract, and created a new need for revision and correction of the ARF drawings (since they had not been checked for accuracy by defendant). Therefore on June 15, 1955, the requirement that plaintiff supply Vandykes and the 44 accessory drawings was deleted from the contract, along with the $5,000 cost of the drawings ($185 of which covered the Vandykes), and in lieu thereof there was added to the contract a requirement for plaintiff to make changes in the ARF production drawings to insure their compliance with contract specifications, with an equitable adjustment in price to be negotiated upon final acceptance of plaintiff’s revised drawings by defendant. The drawings were then delivered to plaintiff. This agreement was formally confirmed by the adoption of Modification 3 to the contract under the standard changes clause. Paragraph h of Modification 3 stated:
It is understood that the contractor agrees to thoroughly check Government furnished drawings covered by SC-DL-72536 for Signal Generator SG-12/ U, SC-DL-72540 for Dummy Lead DA-69/URM-48, and SC-DL-72556 for Case CY-1217/U against the Government furnished models of those components and applicable specifications. The contractor will be-permitted to disassemble models in order to thoroughly check the drawings. Conflicts in design, construction, and characteristics between exceptions listed in bid request and contract, specifications, model, and drawings *77 shall be resolved, and resulting changes incorporated on the drawings, as follows: The requirements of the applicable specifications and exceptions listed in the bid request and contract govern over the models and drawings ; the models govern the drawings, dimensional differences between models and drawings, and all other problems related to drawing revisions, shall be resolved by consultations with the Field Engineering Branch, Signal Corps Engineering Laboratories. Subsequently, construction of the equipment on order shall be in accordance with these revised drawings. Performance of the equipment shall be as specified by the specification (with noted exceptions). The, responsibility for assuring that the drawings have been corrected will be the contractor’s, and the Government will not be responsible for damages or extra costs as a result of the inaccuracies or omissions in the corrected drawings. The contractor agrees to furnish the contracting officer a complete statement detailing his operations in the checking of the Government drawings.
Under Modification 3 the specifications still governed over the model and drawings. Before plaintiff could go into production, all drawings had to be checked and corrected, as under the modification “construction of the equipment on order shall be in accordance with the drawings.” In other words, another process or step was added to the contract, and such process was a 'prerequisite to completion. The drawings were no longer to be used as a mere aid to plaintiff in supplying omissions and in assembly line production, but instead, became the life-blood of production. The ultimate construction bad to be in accordance with the revised drawings. Modification 3 contemplated equitable adjustment for extra work, but contemplated no adjustments for delays and costs attendant to delays in completing the contract, including engineering costs that might be incurred as a result of the added work.
It has previously been shown that both parties expected the drawings to be fairly accurate — this probably accounts for the reason no mention was made of possible delays in Modification 3. It should also be noted that the original $15,000 allocation of funds for engineering costs was not deleted or changed by Modification 3 when the cost for the *78 original drawing revision and Vandykes was deleted, tiras evidencing tbe feeling that engineering costs in correcting tbe AEF drawings would not be great, and in no event, would exceed tbe $15,000 prior maximum.
Plaintiff now contends that the AEF drawings supplied by tbe Government were defective and not in accordance with either the model or the specifications, and that both the model and the specifications were not only in conflict with each other but were also defective and described a product not ready for manufacture as a production item. The question of liability, therefore, depends on the correctness of plaintiff’s contention, and also whether or not the correction of the alleged deficiencies caused plaintiff undue delay in the completion of the contract and added engineering costs not com-pensable under the contract. Whether or not plaintiff’s contentions are valid rests to a large extent upon evidence offered in two categories — changes in specifications, and revisions in the drawings.
Plaintiff submitted 21 TAEs[3] for examination at trial. These TAEs had been approved by defendant during contract performance upon the contingency of no change in contract price or delivery. Of the 21 examined, we have found that the research and engineering necessary to ascertain the need for the issuance of six of the TAEs caused plaintiff delay. These delays are not thus far reduced to a precise measurement in terms of time or money, but should be considered with other delays mentioned infra in an effort to estimate the total delay period of this contract. In addition to the delay were added engineering costs for which plaintiff was not compensated in the sum of $6,235.50.
Plaintiff’s evidence of drawing revisions was that it had over 1,000 changes to make in 600 AEF drawings, and that only a relatively few required no change. At trial, plaintiff selected 21 specific drawings which it considered represented problems of particular significance with respect to deficiencies, resulting in delay, and referred collectively in general terms to the inadequacies of the other drawings not made the *79 subject of specific evidence. It may be concluded that on the whole, the ABF drawings were inaccurate, incomplete and misleading to plaintiff. Many of the revisions were not made to correct errors, though, but made to supply omissions in both the drawings and the equipment itself which the Government, or a less conscientious contractor than plaintiff, may not have felt compelled to make under the requirement of Modification 3. However, of the 21 representative drawings considered in detail, more than 50 percent showed revisions necessary to correct basic errors. The drawings as ultimately revised by plaintiff were greatly improved over the ABF drawings, and supplied detailed data and information which plaintiff or succeeding manufacturers of the signal generator would have found adequate for manufacturing purposes, whereas the ABF drawings were inadequate for manufacturing purposes. The actual extent of revisions to the ABF drawings and improvement of the equipment was not anticipated by plaintiff, and caused it substantial delays in contract performance and research engineering costs for which equitable adjustment ultimately paid provided no reimbursement.
Plaintiff is therefore entitled to recover. It has previously been shown that prior to the addition of Modification 3 to the contract, plaintiff reasonably expected the drawings to be useful in production. This explains the fact why the question of delays or added engineering costs was not mentioned in and/or made a part of Modification 3. The modification was added to the contract at defendant’s insistence. It materially altered the contract by adding the provision that all drawings had to be checked and corrected as a prerequisite to production, and that construction had to be in accordance with the drawings. Absent Modification 3 such a material change in the contract requirements would have constituted a breach. Under Modification 3, however, plaintiff agreed to the provision that the corrections would be made, and that this construction would be in accordance with the drawings, with an equitable adj ustment for extra work. At first glance it might appear that plaintiff had made a poor bargain, and must suffer the losses. But it must be remembered that under the modification, production had to he based on the *80 drawings. Tbe drawings, therefore, became tbe ultimate specifications. It was expected by defendant and plaintiff tbat only minor changes would be made in tbe drawings, that engineering costs would not exceed tbe $15,000 originally allocated by plaintiff, and therefore, tbat tbe supplied drawings would, with tbe minor corrections, be usable for producing tbe item. In fact, as has been shown, they were not usable. As tbe ultimate specifications, tbe AEF drawings became subject to the rule tbat tbe Government implicitly represents tbat if its specifications are complied with, satisfactory performance will result. R. M. Hollingshead Corp v. United States, 124 Ct. Cl. 681, 111 F. Supp. 285 (1953); National Presto Industries, Inc. v. United States, 167 Ct. Cl. 749, 758-759, fn. 6, 338 F. 2d 99, 105 (1964), cert. denied 380 U.S. 962 (1965). This warranty was breached, and recovery is therefore mandatory hi this instance.[4]
While it is true tbat no duplicity was involved on defendant’s part in requiring tbe material change in Modification 3 (defendant presuming tbe drawings were fairly correct) defendant being tbe procurer and supplier of the drawings must bear tbe responsibility for tbe damages tbat resulted from tbe change in requirements. This rule is no harsher than construing an ambiguous contract against tbe party tbat drew it, and in fact is somewhat parallel. Tbe fact tbat defendant presumed the drawings to be useful in production does not alter its warranty, as presumably in all contracts, defendant at tbe outset believes its specifications to be accurate.
Defendant places much reliance on part of paragraph b, Modification 3 which stated:
Tbe responsibility for assuring tbat tbe drawings have been corrected will be tbe contractor’s, and tbe Government will not be responsible for damages or extra costs as a result of inaccuracies or omissions in tbe corrected drawings.
*81 Defendant reads this sentence as a disclaimer on its part relating to the costs incurred in correcting tbe AEF drawings. This court does not read the above quote in the same light. The corrected drawings referred to are plaintiff’s, as are all references to drawings in prior sentences in the paragraph.
Accordingly, we hold as follows:
(1) Plaintiff is entitled to damages for delays incurred in changing specifications (the TAEs) so that drawings could be completed, and in correcting errors in drawings. Mere improvements in the drawings were not required by Modification 3 and should not be considered in figuring the delay.
(2) Plaintiff is entitled to the added engineering costs to the extent that no remedy was available for such costs under Modification 3, or the changes clause of the contract.
Judgment is hereby entered for the third party plaintiff, Philips Electronics, Inc., the real party in interest, with the amount of recovery to be determined under Eule 47(c).
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff. North American Philips Company, Inc., the nominal plaintiff, and Philips Electronics, Inc., a sister corporation, are both referred to interchangeably as plaintiff. They are both Delaware Corporations with principal offices in New York City, New York. Plaintiff is a highly competent manufacturer of electronic products. By contract Modification 14 of April 11,1957, the former duly transferred its entire interest in the contract in suit to the latter, and the latter was formally recognized by defendant as the successor in interest. Thus North American Philips Company, Inc., has no present interest in the outcome of the present suit, the real party in interest being the transferee, Philips Electronics, Inc.
2. Description of signal generator. The signal generator which is the subject matter of the contract in suit is a pre- *82 cisión, test instrument providing both frequency-modulated (fm) and radio-frequency (rf) signals for measurement purposes. It contains numerous tubes and other electronic components. It is designed primarily for use with components of standardized radio sets.
3. B <& D contract to ABF. On November 29, 1951, a negotiated contract was entered into between A.E.F. Products Inc. (hereinafter referred to as AEF), and the Government to research and develop an SG-12 signal generator and supply the Government with 470 units at a price of $2,494.75 each. Eesearch and development contracts are often let by the Government to procure a piece of equipment not theretofore manufactured.
4. D & P contract to ABF. In 1952 the defendant’s research and development contract with AEF was enlarged into a development and production contract for the development and production of 1,286 signal generators of the type produced by AEF under its earlier research and development contract. Although negotiations had been conducted by the Government with Motorola, Inc., as a potential supplier of 849 sets, it was decided by defendant that its future requirements would not warrant the cost of setting up additional sources. AEF subcontracted 849 sets to Motorola. A development and production contract is frequently awarded to a manufacturer on the completion of a research and development contract under which a new product has been developed, and is generally a transitional or interim procurement step between the research and development contract and an eventual production contract.
5. Initiation of procurement in suit. After determining the need for procurement of additional signal generators and allocating funds for that purpose, the Signal Corps Engineering Laboratories at Fort Monmouth issued a procurement directive dated November 18, 1954 to the Supply Agency in Philadelphia, recommending procurement of additional AN/UEM-48 signal generators on the basis of information in the procurement data letter. The directive provided:
(1) If equipment is procured from A.E.F. Products Incorporated changes to drawings being furnished on *83 Order 14210-PHILA-51 for Generator, Signal SG-12 ( ) /U should be procured.
(2) If equipment is procured from a new contractor, drawings should be procured for Generator, Signal SG-12 ( ) /U per Standard Clause 187. * * *.
Upon receiving the procurement directive Mr. DiCampli, an authorized engineer representative of the Supply Agency, collected the documents listed in the procurement directive and searched for drawings suitable for use by prospective bidders in computing costs for bidding purposes. None were found.
6. ABF drawings. Under its development and production contract with the Government, AEF was required to furnish a complete set of finished production drawings from which copies could be made for future procurements. On December 1, 1953, the Government received 205 checkprints of drawings from AEF and another 581 checkprints on August 10,1954, so that as of February 14, 1955, a complete set of AEF checkprints were in the Government’s possession. These checkprints would not have been of use to the Government for procurement purposes or usable to bidders for cost estimation or production because they were neither final nor necessarily accurate, and had not been checked by the Government, nor were they reproducible without prohibitive cost. In other words, there was no assurance that they accurately depicted in all respects the signal generators required by defendant. On April 27, 1955, the appropriate Signal Corps agency at Fort Monmouth received a complete set of production drawings from AEF, and they were cursorily inspected and approved on May 16, 1955. These were the only production drawings received by the Government from AEF. In the meantime plaintiff had become the successful bidder on the procurement hi suit, and copies of the AEF production drawings were furnished plaintiff in installments from about July 15,1955 to August 4,1955, by which time plaintiff had received a complete set. At the time bid invitations for the procurement in suit were issued (January 18, 1955), AEF did not know just when its production drawings would be completed. There is no evidence that AEF was deliberately holding back on the delivery of drawings in order *84 to gain preferment over its potential competitors with, respect to the new procurement.
7. Absence of drawings in bid invitation. Despite the absence of production drawings for the signal generator, Mr. DiCampli instituted bid solicitation procedures. He concluded that available information (model, specifications, technical manual, and photographs) was sufficient for calculation of bids, as was subsequently so held by the contracting officer. As a presolicitation measure DiCampli sent to prospective bidders a “feeler card” to determine those interested in bidding. To those responding he sent bid invitations on January 18, 1955, containing a statement, inter alia, that drawings were not available. Under the standard procedure of the Signal Corps Supply Agency, if suitable drawings had been available they would have been included in the invitations regardless of the number of bidders.
8. Items 5 and 6 in irmitation. Since comprehensive drawings were desired by the Government, the following two items were listed in the invitation for price quotations by prospective bidders:
Item No. (5)
Complete set of reproducible Vandykes of manufacturer’s own drawings covering sub-item (1-1) Signal Generator SG-12 ( )/U. These drawings are to be
in accordance with conditions specified elsewhere herein.
Item No. (6)
Production drawings per Specification MIL-O-12464 (SigC) and amend #2 for all items not covered by item 5 above.
The Item 5 requirement involved about 600 drawings and plaintiff’s bid estimate provided $185, apparently as the cost of paper alone. The Item 6 requirement related to about 44 drawings for the case and dummy load, which are accessories to the signal generator. The plaintiff’s bid estimate provided $15,000 in engineering costs and $5,000 for drawings under Items 5 and 6, of which $185 was for Item 5 as stated above. “Manufacturer’s own drawings” are substantially different from production drawings in that *85 they are less formal and not necessarily as accurate or complete as production drawings, since they primarily serve the internal needs of the particular contractor, as opposed to other potential contractors. For example, manufacturer’s own drawings may be mere sketches instead of finished production drawings, which latter permit any competent manufacturer to produce according to specifications. Vandykes are copies of drawings made on translucent paper with heavy ink. Copies can readily be made from Vandykes in quantity.
9. Information furnished to bidders. Between issuance of bid invitations on January 18,1955 and submission of plaintiff’s bid on February 18,1955, the defendant had on display at Fort Monmouth a model of the signal generator and had representatives there to give advice and information to bidders. The model was assembled and it was not possible to make a detailed examination of its components without dis-assembly, which was not feasible or permitted. Also available for examination by bidders were specifications and a copy of the Army Technical Manual containing descriptive data, pictures, diagrams, and a probably inaccurate and incomplete parts list of the signal generator. No production drawings of the equipment were available since ABF had not as yet furnished such drawings to the defendant. Bepre-sentatives of the plaintiff spent a day at Fort Monmouth prior to February 18, 1955, obtaining information relevant to the procurement, including the data enumerated above. They were aware of the fact that no production drawings were available. However, defendant’s representatives told the plaintiff’s agents on that occasion that, although it was not then known when ABF would deliver its production drawings to the Government, the drawings when available would be furnished the successful bidder for the pending new procurement.
The information which was available for the plaintiff and other bidders at Fort Monmouth was sufficient to make only an inexact estimate of costs for bid purposes. Examination of production drawings and disassembly of the display model would have been necessary for a more accurate estimate of costs. Production drawings are more useful than performance specifications in estimation of costs. It is customary *86 and desirable in comparable procurements to furnish production drawings to bidders, but it is also not uncommon in procurement of equipment of complexity comparable to a signal generator that production drawings are not furnished bidders because they are not available, as in this instance. Twenty-seven bidders besides the plaintiff submitted bids at unit prices ranging from $480 to $1,850 (a 385 percent spread), compared to plaintiff’s bid of $644 and the $843.76 bid of ARF, which company had an advantage derived from its experience in performing previous contracts as related in findings 2 and 3, sufra. Plaintiff’s ultimate cost of production was claimed to be approximately $870 per unit. There was a substantial risk involved in plaintiff submitting a bid under the circumstances, but the willingness of at least 26 other bidders to voluntarily take this risk relieves the Government of any charge of being unorthodox, irregular, or unfair in this particular procurement, and at the same time alleviating to a large extent the question as to plaintiff’s wisdom in taking a chance of misjudgment.
10. Underestimates in flaintifs bid. The worksheet underlying plaintiff’s bid on the contract noted that “no prints [i.e., drawings] furnished by Gov.”, and “It is possible that unit may have materials not called out on worksheet.” The parts list in the Technical Manual was not reliably accurate or complete. Plaintiff’s bid worksheet contains alternative cost estimate summaries, one at $686 per unit and the other, which was submitted, at $644. This estimate contained a 2 percent risk factor, or $8.66 per unit, to cover possible mistakes in material requirements. To illustrate plaintiff’s underestimation of costs, by February 1956 the plaintiff found that its commitments for material costs alone would exceed its cost estimate of materials by $81,240, not counting overhead additions to this figure. Furthermore, plaintiff’s estimate of packing and packaging costs proved to be $8,163.20 too low. By November 15, 1955, plaintiff had expended $6,874 of the $15,000 allowance in the bid estimate for engineering costs, but about 30 percent of the drafting and engineering time expended was in revising and correcting drawings which it had obtained from the defendant after contract award (see finding 12, infra). By April 4, 1956, *87 plaintiff’s engineering costs had exceeded the allowance for engineering in its bid estimate by about 50 percent or more, part of which was thought to be possibly recoverable in negotiations for production drawings under Modification 3 to the contract (see findings 45 and 46, infra).
It is also relevant to note in connection with plaintiff’s bid that, while the bids ranged as low as $480 per unit, and four companies besides plaintiff submitted bids between $644 and $682, the bid from AEF was for $843.76 per unit. Of all bidders AEF was the only company with personal experience as to costs of manufacturing the unit, and moreover had the benefit of drawings, tools, molds, dies, and “know-how” derived from its two contracts to research, develop and produce the signal generator since 1951.
11. Award of contract. Plaintiff’s bid was submitted February 18, 1955. Bids were opened February 21, 1955, and it was found that plaintiff was the lowest responsible bidder. Another bidder challenged the award to plaintiff alleging a defect in plaintiff’s bid. The problem was surmounted after some delay and the contract was awarded to plaintiff on May 20, 1955 to manufacture and deliver 652 signal generators, plus accessories and drawings. In June 1955 the quantity was increased by 335 units at a reduced price of $619 each, thus aggravating the plaintiff’s eventual loss. By the time of this additional procurement plaintiff had not received the AEF production drawings and had little or no knowledge of the problems it was to encounter. Two preproduction samples were due from plaintiff by October 17,1955, and the balance of the 987 units were to be delivered in installments from March through October 1956. By Modification 7, issued July 13, 1956, due to delays stated to be “caused by reasons beyond the Contractor’s control”, the delivery schedule was revised to commence August 1956 and be complete March 1957. The contract and invitation for bid required the production of a signal generator in accordance with “Specification MIL-G-10484A (Sig C), dated 3 November 1952 and amendment #2 dated 8 November 1954 and Model available at Signal Corps Engineering Laboratories * * Paragraph 3.1.1 of Specification MIL-G-10484A *88 (Sig C), dated November 3, 1952, provides: “Construction. Unless otherwise specified herein, all components of Generator Signal AN/UEM-48 ( ) shall conform to the model.” Paragraph 3.41 of Specification MIL-T-945A, which was a specification subsidiary to and incorporated by reference in Specification MIL-G-10484A (Sig C), provided that “* * * Where drawings or a model are supplied to the contractor for his guidance (unless otherwise stated in the detail specification) , this specification and any specification to which it is subsidiary shall govern over the drawings or model. * *
12. Modification S. On April 27, 1955, the AEF production drawings were finally delivered to the Production Drawings Branch of the Signal Corps, which reviewed and approved them on May 16, 1955, four days prior to the award of the contract in suit to the plaintiff. However, they were not checked by the Government to determine whether they accurately reflected the AEF signal generator, and defendant advised plaintiff that it was uncertain of the accuracy of the drawings. The availability of these AEF production drawings obviated the need for Items 5 and 6 in plaintiff’s contract relative to drawings (finding 8, supra), and created a new need for revision and correction of the AEF drawings in the course of plaintiff’s performance of its production contract. Because of this, on June 15, 1955, the contracting officer proposed to plaintiff in writing that Items 5 and 6 be deleted from the contract, together with the $5,000 contract price thereof, and that in lieu thereof there be added to the contract a requirement for plaintiff to make changes to the AEF production drawings to insure their compliance with contract specifications, all at an equitable adjustment in price to be negotiated with plaintiff upon final acceptance of the plaintiff’s revised drawings by the defendant. On June 22, 1955, the plaintiff concurred in defendant’s proposal and requested that delivery of the AEF drawings be expedited. The AEF drawings were delivered to plaintiff by defendant in stages between July 15 and August 4, 1955, as stated in finding 6, supra. The letter agreement between the parties was formally confirmed on September 14,1955, by the adoption of Modification 3 to the contract under the standard *89 Changes clause. Paragraphs h and i of Modification 3 provided as follows:
h. It is understood that the contractor agrees to thoroughly check Government furnished drawings covered by SC-DL-72536 for Signal Generator SG-12/TT, SC-DL-72540 for Dummy Lead DA-69/IXRM-48, and SC-DL-72556 for Case CY-1217/U against the Government furnished models of those components and applicable specifications. The contractor will be permitted to disassemble models in order to thoroughly check the drawings. Conflicts in design, construction, and characteristics between exceptions listed in bid request and contract, specifications, model, and drawings shall be resolved, and resulting changes incorporated on the drawings, as follows: The requirements of the applicable specifications and exceptions listed in the bid request and contract govern over the models and drawings; the models govern the drawings, dimensional differences between models and drawings, and all other problems related to drawing revisions, shall be resolved by consultation with the Field Engineering Branch, Signal Corps Engineering Laboratories. Subsequently, construction of the equipment on order shall be in accordance with these revised drawings. Performance of the equipment shall be as specified by the specification (with noted exceptions) . The responsibility for assuring that the drawings have been corrected will be the contractor’s, and the Government will not be responsible for damages or extra costs as a result of inaccuracies or omissions in the corrected drawings. The contractor agrees to furnish the contracting officer a complete statement detailing his operations in the checking of the Government drawings.
i. It is understood that changes to production drawings will be used by the Government for checking equipment produced on the contract and reprocurement of the equipment or procurement of maintenance items for the equipment.
In addition to receiving the ABF drawings from the Government by August 4, 1955, during the summer of 1955 the plaintiff received directly from ABF approximately 10 to 15 of the latter’s drawings primarily depicting mechanical components. To a limited extent it was established by the defendant that certain of the changes made by plaintiff to the drawings supplied by the defendant were duplicated in *90 some of the drawings supplied plaintiff directly by ARF, thus eliminating certain engineering costs by plaintiff in performing Modification 3. So far as the record establishes, the saving to plaintiff was no more than minimal.
13. Furnishing of models. Pursuant to provision 14 of the contract, the model of the signal generator which plaintiff and other bidders had inspected at Fort Monmouth during the bid period was loaned to plaintiff as the successful bidder on or about May 31, 1955. This model was represented to be the latest version of the signal generator produced by ARF under its contract with the Government, and conditions imposed on its use by plaintiff precluded its dis-assembly. On August 29, 1955, plaintiff requested defendant to furnish it another signal generator of the same type which could be disassembled and checked against the ARF drawings provided by the defendant, in order to perform the requirements imposed by Modification 3 to the contract with respect to revising the ARF drawings, as well as to expedite plaintiff’s engineering and production of the units under its contract. On September 6, 1955, the defendant supplied a second signal generator for the purposes described above.
14. Preproduction samples. Provisions 5 and 18 of the original contract required the plaintiff by October 17, 1955 to submit two preproduction sample signal generators to the defendant for examination, test and approval. In order to fabricate preproduction samples it was first necessary for plaintiff to complete its shop drawings, which in turn meant that it must have completed the necessary revisions to the ARF drawings supplied by the Government under Modification 3. As of October 4,1955, the plaintiff had revised many of the ARF drawings and had made from them its own original manufacturing drawings, but discovered that it would have to rework all drawings made to date by noting all corrections on the face of the new drawings. Plaintiff estimated that this requirement under Modification 3 would add approximately one-half or more to the cost of the drawings. Because of the delay in revising the ARF drawings the plaintiff could not order parts for the preproduction samples until October 15,1955.
*91 On December 20,1955, the plaintiff advised the defendant that its preproduction samples would be ready for testing on December 23. The delay was due in part to late deliveries by some suppliers, and because of problems involved in TAE’s (see findings 16-19, infra). In order to expedite the contract plaintiff offered its facilities for testing the preproduction samples at plaintiff’s plant. The offer was accepted with the proviso that there would be no additional cost to the Government, and no delay in delivery. The first preproduction sample was ready for testing on J anuary 12,1956. Tests on plaintiff’s .first preproduction sample were started on J anuary 15, 1956, with results being officially reported February 9, 1956. Defendant again tested the preproduction samples at plaintiff’s plant from February 20 to March 7, 1956, and on March 20, 1956. The samples were approved subject to correction of certain deviations in the course of production. There is no reason to conclude that the defendant delayed in testing the preproduction samples. The contract gave the Government 60 days to perform these tests.
15. Olaim of defective and misleading specifications, drawings., and model. The plaintiff contends that the AEF drawings supplied by the Government were defective and not in accordance with either the model or the specifications, and that both the model and the specifications were not only in conflict with each other but also were defective and described a product not ready for manufacture as a production item. The question of liability, therefore, depends on the correctness of plaintiff’s contentions, and also whether or not the correction of the alleged deficiencies caused plaintiff undue delay in the completion of the contract and added engineering-costs not compensable under the changes clause or Modification 3 to the contract. Whether or not the plaintiff’s contentions are valid rests to a large extent upon the evidence offered in two categories. One relates to the approval of Technical Action Eequests (see findings 16 through 19, infra) . The other relates to numerous revisions made to the AEF production drawings supplied by the Government pursuant to Modification 3 (see findings 20 through 44, infra).
*92 TeohNical Action Requests
16. TAB's and FEB's defined. TAR, an abbreviation for Technical Action Request, is a formal request initiated by the contractor for Government approval of a deviation from contract requirements, or for an interpretation, information or recommendation concerning a contract term, specification, or problem encountered in performance. Similar TAR’s initiated by the Government bore the prefix FEB (representing Field Engineering Branch) before sequential numbers starting with 1, and were directed to the contractor.
17. 'Warning no dee on TAB and FEB forms. Each TAR and FEB in the instant case was submitted on a printed form which contained the following “information blocks” and warning notice at the top of the first page:
10. Purpose
□ Deviation □ Interpretation □ Information □ Recommendation Approval
11. Approval Will Afegct :
Price (increase-decrease) : Delivery: Interchangeability:
(If Price, Delivery or Interchangeability Is Affected, Explain Below)
Caution : Increase in Price and/or Change in Contract Delivery Schedule Requires Prior Approval oe the Contracting Officer.
An “x” was to be placed in the appropriate boxes or spaces of each form.

18.Effect of TAB's on •price and delivery schedule, and on plaintiff's costs.

(a) Of the 21 TAR’s submitted by plaintiff, the latter “x’d” the paragraph 11 “delivery” block 18 times (TAR’s 1, 3, 4, 5, 6, 11, 12, 13, 14, 15, 16, 17 and 18); it “x’d” both the “delivery” and “interchangeability” blocks once (TAR 5); and only on one TAR (TAR 9) did plaintiff request a price increase (41 cents per unit). With regard to virtually every TAR approved by the Government, the following sentences (with slight variation in words but not in meaning) imme *93 diately preceded tbe approval signature of the Government representative:
The above is contingent upon no change in the contract price and no delay in delivery.
The above in no way releases the contractor from compliance with any requirement of the contract and applicable specifications, unless otherwise specified herein.
Also, with the exception of TAP. 9 which requested a price increase of 41 cents per unit, and which was rejected by the Government, not one of the 21 TAP’s submitted by the plaintiff contained an explanation of any price increase (as required by block No. 11 in the caption of each TAP form), and none contained a reference to a possible increase in price to the Government.
(b) These entries on the TAP forms require some explanation in order not to be misleading. For example, where the plaintiff on a TAP form requested approval of a deviation from specifications and indicated (by silence) that the change would not increase the contract price, plaintiff meant that the cost of manufacturing the unit would not be altered, and not that the costs incurred by plaintiff in ascertaining the need or desirability for the change should not be compensated. That this was the contracting ofiicer’s understanding is evidenced by 'his subsequent offer, pursuant to plaintiff’s claim of April 26,1957, to equitably adjust the contract price to compensate plaintiff for expenses incurred in connection with certain TAP’s, even though in those TAP’s the plaintiff had not indicated in the form that an increase in contract price would be occasioned.
(c) In its claim letter to defendant of April 26,1957, the plaintiff claimed a total of $15,540 for its alleged costs in testing to ascertain need for corrections of or deviations from specifications. Details of all of the 21 TAP’s are contained in the record. It has been concluded on the basis of analysis that the contracting officer was in error in denying plaintiff’s claims totaling $6,235.50 for TAP’s numbered 1, 3, 4,12,16 and 21 (compared to the $15,540 claimed by plaintiff for all 21 TAP’s). As to TAP-13 the contracting officer appeared to agree with plaintiff’s contentions and directed plaintiff to itemize its claim for $825, but the plaintiff never did. As *94 to TAR-7 the contracting officer also appeared to agree with plaintiff’s contentions and ruled that the claim of $400 should be considered in the course of negotiations for an equitable adjustment under Modification 3 (findings 45 and 46, infra,), which supposedly was done. With respect to the plaintiff’s claims under TAR’s numbered 1,3,4,12,16 and 21 the plaintiff has not produced proof of its costs because the issue of damages was separated for subsequent disposition due to the sudden illness at trial of plaintiff’s witness on damages.[1] With respect to TAR’s numbered 1, 3, 4, 13, 16 and 21 it would also appear that, in addition to incurring certain costs as claimed in plaintiff’s claim of April 26,1957, the plaintiff was also caused certain delays in performance as a result of mistakes attributable to the Government. These delays are not thus far reduced to precise measurement in terms of time or money, but will be considered with any other delays described elsewhere in these findings in an effort to estimate the portion of plaintiff’s losses which should be charged to the Government. The facts involved in TAR’s numbered 1, 3, 4, 7, 12, 13, 16 and 21 are presented herewith (paragraphs d through k of this finding) in some detail, since it has been concluded that the plaintiff’s claims arising from these TAR’s are justified in some degree. The facts as to the other TAR’s are not to be presented, for the sake of brevity.
(d) TAB-1, grounding rings. TAR-1, dated October 3, 1955, stated that the grounding ring required by the specifications to mount on the tuning control shaft, as shown in ARF drawing 45B16, would not mount. Defendant was notified of the problem September 16, 1955 by plaintiff, which suggested a possible solution on September 28, 1955 and requested prompt authorization because plaintiff was unable to order procurement of a front panel casting and associated parts until a decision was made. The TAR was to inform defendant of the situation officially and indicated that the matter affected delivery dates under the contract, but did not indicate that it affected the contract price. On October 10, 1955, the defendant authorized plaintiff by telephone to *95 eliminate the grounding ring, and confirmed this instruction in writing on October 13,1955, all contingent on there being no change in price or delivery dates. On April 26, 1957, plaintiff requested payment of $648 for materials and labor (two weeks or 80 hours) for its costs in studying and solving the grounding ring problem. On May 29,1957, the contracting officer rejected plaintiff’s claim on the grounds that the plaintiff’s opportunity at bidtime to examine a model and drawing of the grounding ring should have provided sufficient information for fabrication and installation thereof.
The contracting officer testified that the grounding ring was not in the model seen by plaintiff but was added by amendment to the specifications. He stated that plaintiff learned after much experimentation that the grounding ring added by amendment to the specifications would not fit, so it was deleted. Plaintiff testified that this was not an unusual problem.
It thus appears that, in essence, the Government ordered plaintiff to install a grounding ring of certain specifications on the timing dial shaft, that a ring made to the specifications would not fit, and that ultimately the ring was unnecessary because the Government ordered its deletion and the signal generator performed within required limits without the ring.
(e) TABS, fuses. The fuses specified in the contract and contained in the model were of the wrong type and not usable because their capacity was less than the requirements of the signal generator. On October 17, 1955, by TAE-3, plaintiff requested permission to substitute a fuse of a larger capacity by a different manufacturer. The TAB. indicated that approval of the request would affect delivery, and did not indicate that it would affect price. On October 27,1955, the defendant admitted the erroneous designation of the fuse, gave the designation for the proper fuse, and rejected plaintiff’s request to use a substitute fuse by a different manufacturer. Use of the fuse directed by the defendant continued to result in testing failures, but all generators shipped contained that type fuse. On April 26, 1957, plaintiff submitted a claim to the contracting officer stating that it had *96 expended $150 in labor, $50 in material, and $200 in engineering testing to overcome the mistake in designation of the fuse. On May 29, 1957, the defendant instructed the plaintiff to compile costs incurred to correct the errors so that an equitable adjustment could be made. It does not appear that in its subsequent schedules itemizing its overall claims for an equitable adjustment of contract price the plaintiff specifically included the costs under TAN-3.
(f) TAB-Jh IF and BF out-put boxes. Specifications required plaintiff to mark the IF & EF output boxes in each signal generator to indicate their output impedance, and to secure advance approval by the contracting officer of the proposed marking device prior to fabrication. On October 24, 1955, by TAE-4, plaintiff submitted to the contracting officer its proposed marking method, which seemed to comply with the literal requirements of the specifications. On November 10,1955, the defendant disapproved the proposal and ordered plaintiff instead to fasten to each output box a nameplate containing not only a statement of the output impedance, but also a circuit diagram showing the resistance value of each component within the box. The model bore no such markings. This was clearly beyond the relevant specification requirements.
On April 26,1957, the plaintiff claimed reimbursement of $850 for its engineering expenses in exceeding specification requirements. On May 29, 1957, the contracting officer rejected the claim on the grounds that the work was in accordance with contractual requirements.
(g) TAB-7, resistors B21¡. and B25. On September 19 1955, the parties verbally agreed that plaintiff should substitute two equal value resistors contained in the model with a combination single resistor in order to eliminate unnecessary work and simplify the terminal board. The oral agreement was confirmed by plaintiff’s TAE-7 of November 3, 1955, which was approved by the contracting officer on November 18,1955, contingent upon no change in contract price or delivery schedule. The unit would have worked as well with two resistors as with one resistor of double capacity. The change simplified plaintiff’s assembly work. The change involved changes of the schematic, parts list, and assembly *97 drawings. On April 26, 1957, the plaintiff claimed $400 incurred in engineering costs involved in the TAE, and on May 29, 1957, the contracting officer ruled that the costs should be included under Modification 3 to be negotiated later. It cannot be determined from the present record whether it was so included.
(h) TAB-12, potentiometer val/aes. On January 24,1956, by TAK-12, the plaintiff requested a deviation approval to use standard value 25,000-ohm potentiometers instead of nonstandard 20,000-ohm potentiometers prescribed by specifications. Immediate advice was requested because orders were being held up. On February 6, 1956, the contracting officer approved the deviation request provided there was no change in contract price or delivery schedule. On April 26, 1957, the plaintiff claimed $250 for engineering costs incurred in ascertaining the need for the change. On May 29, 1957, the contracting officer disallowed the claim on the grounds that no work over contract requirements would have been necessary if plaintiff had complied with the requirements of contract provision 27, and with TAE FEB-1. Contract provision 27, entitled “Electronic Standard and Nonstandard Parts, Material and Processes” is a technical five-page provision which in general prescribes the use of standard parts wherever possible, and sets up a procedure for contractors to obtain permission to use nonstandard parts. TAE FEB-1, dated September 12,1955, is an instruction by the contracting officer to plaintiff implementing contract provision 27 and directing plaintiff to submit lists of parts to be used as soon as possible. So far as can be seen or has been pointed out by defendant, neither contract provision 27 nor TAE FEB-1 provides that where the specifications prescribe a nonstandard part and the contractor incurs expenses in determining to the contracting officer’s satisfaction that a standard part is preferable, the contractor is not entitled to be reimbursed his expenses in correcting the defendant’s error. The plaintiff claims to have expended $250 in engineering costs in this connection, for which it was not reimbursed.
(i) TAB-13, pilot bulbs. On January 26,1956, by TABr-13, the plaintiff requested deviation approval to substitute *98 a pilot bulb made by the Matchless Electric Company for one made by General Electric Company, which was prescribed in the specifications but not available for delivery without a lengthy delay. The model contained a bulb made by the Matchless Electric Company, which was available out of stock. On February 17, 1956, the contracting officer authorized plaintiff to use 200 bulbs made by the Matchless Electric Company in order to avoid delay in delivery, but directed that plaintiff continue in its efforts to procure the General Electric bulb specified. On April 26, 1957, the plaintiff filed a claim with the contracting officer for reimbursement of expenses of $825 incurred for labor, material and engineering time spent in looking into the problem. On May 29, 1957, the contracting officer directed plaintiff to compile its costs to correct the error for the purpose of making an equitable adjustment in contract price. The plaintiff never did so. The plaintiff alleges that this item delayed delivery of the completed units.
(j) TAB-16, capacitors. On February 16,1956, by TAR-16, the plaintiff requested deviation approval to use two capacitors which were the same as those contained in the model but different from those in the specification, in order to obtain a shorter length for assembly purposes and to lower the voltage capacity to eliminate interference, but still not altering the quality, dependability or interchangeability of the completed unit. On March 1,1956, the contracting officer approved the request, contingent upon there being no change in contract price or delivery schedule. On April 26, 1957, the plaintiff claimed $995 as reimbursement for its engineering and labor expenses incurred in solving this problem. On May 29,1956, the contracting officer disallowed the claim on the grounds that no work over and above the contract requirements would have been required if plaintiff had complied with the requirements of contract provision 27 and TAR FEB-1. These references are those described in the discussion under TAR-12, paragraph h, supra. They do not seem to provide grounds for the contracting officer’s disallowance of plaintiff’s claim, since had the specifications prescribed the correct capacitors there would have been no need for the *99 plaintiff to have incurred expenses in determining the need for substitutions.
(k) TAR-%1, beat power output. On October 23, 1956, by TAR-21, the plaintiffs requested a deviation approval to remove a 0-5 capacitor to meet the beat note power requirements of the specification. The schematic diagram supplied by the Government showed the C-5 capacitor installed on the plate side of the output transformer to the ground. This capacitor was so located in the model, and at high frequencies provided an insufficient output. The plaintiff’s units assembled in this manner had the same defect, until the plaintiff found that by putting the C-5 capacitor on the B+ side of the output transformer the unit would increase the proven output up to and beyond the maximum limit required by the specifications. On October 30, 1956, the contracting officer approved the TAR, and directed that all necessary changes be made in the drawings, parts lists, technical manual, and circuit labels. On April 26, 1956, the plaintiff filed a claim with the contracting officer for reimbursement of $3,092.50 expenses incurred for labor, material and engineering cost in determining the difficulty, and in reworking and retesting all completed units, and in revising circuit labels, schematics, instruction manuals and drawings. In the course of such efforts the plaintiff discovered, and so advised the contracting officer, that there were spurious beat notes on the odd frequencies which required as a solution a complete redesign of the RF portion of the unit. As to this suggestion the contracting officer decided instead to overcome the shortcoming by including an appropriate caution notice in all instruction manuals. On May 29,1957, the contracting officer disallowed plaintiff’s claim, ruling that the original specification requirements were not impossible for production and were relaxed for plaintiff’s convenience in order to cure production problems. On the basis of the available evidence it is concluded that TAR-21 was approved by the contracting officer in order to correct a defect in specifications and was, therefore, for the Government’s benefit rather than the plaintiff’s manufacturing convenience. In addition to the costs claimed by the plaintiff on April 26,1957, it is also concluded that the situation caused plaintiff substantial delays in pro *100 duction, the extent of which cannot accurately be determined because they are intermingled with other delaying factors.
19. FEB’s. In addition to 21 TAR’s, there were six FEB’s in the contract, all of which became part of the contract at no change in consideration.
RevisioN op ARF Drawings
20. Inadequacy of ABF production drawings. A major element in plaintiff’s claim for damages is that the ARF production drawings, which it was to revise and correct under Modification 3 (finding 12, supra), were found to be so defective and deficient, and so out of correspondence with the specifications and model supplied by the Government, that the plaintiff was put to greater expense and delays than it could reasonably have contemplated in performing both the basic contract and Modification 3. Plaintiff contends that the payment it ultimately received under Modification 3 did not compensate it for the delays it encountered and the research engineering costs it expended, due to the causes stated above. In their requested findings the parties offer generalities and broad conclusions presumably based upon the voluminous detailed testimony and exhibits in the record, but they fail to present the specifics of each problem. Naturally the parties offer diametrically opposing general conclusions as to the adequacy of the ARF production drawings. In order to determine the adequacy issue it is necessary first to consider in detail each of the alleged deficiencies in drawings which were the subject of specific evidence. Since there were over 600 ARF production drawings involved in plaintiff’s performance of Modification 3, and it was obviously not feasible to consider each drawing separately at trial, the plaintiff selected some 21 specific drawings which it considered represented problems of particular significance with respect to deficiencies resulting in delay, and to refer collectively in general terms to the inadequacies of the other drawings not made the subject of specific evidence.
21. I.F. Attenuator. ARF drawing SC-C-72631, I.F. termination assembly, was corrected in the following respects :
*101 (a) A coverplate on the model was not shown on the drawing. This was a minor drawing error.
(b) A nameplate newly required by the contract was not shown on the drawing, nor would it be expected to be shown, because such a nameplate was not included in the previous ABF contract.
(c) Two drive screws were added to the drawing and the material list to reflect the model, thus requiring a new drawing layout at that point.
(d) A capacitor required by the contract was lacking in the drawing until corrected by plaintiff.
(e) The wire specification in the material list was updated to correspond to the latest specification.
(f) An erroneous part number designation for a clip lead was corrected.
Some of the foregoing corrections made to the AKF drawing were normal and some, as in paragraphs c, d and f, were not.
22. Meter. Plaintiff changed ABF drawing SC-C-72685, showing the meter, to add instructional information on the dial face, and to alter the depth of the meter so as to provide a greater tolerance to fit inside a stamped metal case. The drawing ultimately approved by the Government shows that the plaintiff’s proposal to add information to the dial face was not adopted, while the other proposal as to dimensions was adopted. The change made was apparently an improvement to the ABF plan rather than correction of an error.
23. Housing. ABF drawing SC-C-72749, relating to the housing for the meter, was changed in numerous respects by plaintiff. A new sectional view added to show interior dimensions was necessary for purposes of casting the piece, and was not contained in the furnished drawing. The data for this sectional view was measured from the model. Other measurements shown on the ABF drawing did not correspond to the model and had to be redimensioned by plaintiff on its revised drawing, which also included deviation tolerance data to facilitate manufacture. A hole shown on the ABF drawing as not tapered was corrected on plaintiff’s drawing to be tapered to correspond to the model. Plaintiff changed the notes on the drawing to provide alternate aluminum *102 alloy choices as per specifications, and changed the finish treatment to agree with specifications in order to improve electrical conductivity. While certain of the revisions made by plaintiff to the AEF drawing were merely nonessential improvements, others were to correct errors and supply omissions in the furnished drawing.
24. Cable assembly. Changes made by plaintiff to AEF drawing SC-D-72827, the front panel cable assembly, represented improvements rather than corrections of errors. They were required neither by specifications nor by the model, but merely added certain leads to the harness assembly in order to facilitate manufacture.
25. Calibrator amplifier. Plaintiff made substantial changes to AEF drawing SC-B-72856, calibrator amplifier board assembly. The basic change was to substitute two shorter condensers for those shown in the furnished drawing, in order to facilitate mounting and replacing them, and to reduce the danger of the condensers shorting out. The provision for using shorter condensers required corresponding changes in the wiring diagram and material list. As changed the drawing not only provided a more practical system, but also provided necessary information to assembly line workers that was absent from the furnished drawing. It could not be said that the changes made were to correct errors in the furnished drawing, but merely to effect an improvement.
26. Chassis riveting assembly. Plaintiff changed AEF drawing SC-D-72843, chassis riveting assembly, to remove some details and add others, including the addition of a rivet which was contained in the model but not shown on the furnished drawing. There were no significant changes in the construction of the chassis, and the omission of the rivet reference in the furnished drawing may be considered only a minor error not contributing significantly to the plaintiff’s delay.
27. Braclcet. AEF drawings numbered SC-B-72542 and SC-B-72543, covering two brackets, required minor improvements consisting of one change in dimension and insertion of an angle dimension in each, and insertion of certain notes *103 regarding the type aluminum to be used and the finish on edges. These were minor corrections well within the scope of Modification 3.
28. Power filter assembly. Plaintiff made extensive revisions to ABF drawing SC-C-72860, power filter assembly. The two basic accomplishments of the revisions were (a) to depict an attenuation curve, based upon testing procedures, which provided a necessary performance criteria for the filter to meet, and (b) to encase the filter in a hermetically sealed case instead of an ordinary metal case which would permit dampness and dirt to affect the characteristics of the filter. There were no specifications as to the performance criteria of the filter and the ABF drawings did not prescribe or disclose such criteria. By providing the required criteria, through testing, plaintiff made it possible for a subcontractor to supply filters composed of optional circuit arrangements which would comply with performance requirements. Filters made according to the description in the furnished drawing would have too many variables to give a standard performance, and the data supplied by plaintiff in the revised drawing cured this defect. The revised drawing also provided information omitted on the furnished drawing, to permit manufacture, such as maximum voltage, frequency range, temperature range, capacity to ground of the terminals, etc. It is concluded that the plaintiff’s revised drawing not only improved the furnished drawing with respect to providing a hermetically sealed case and more detailed manufacturing instructions, but cured what may be considered a basic defect in both the specifications and drawings by providing operational standards indispensable to manufacturing a filter which would give consistent performance. In this respect the plaintiff’s performance exceeded the work reasonably contemplated under Modification 3. Defendant denied plaintiff’s claim for reimbursement of $500 in engineering costs on the grounds that, although the Government approved the hermetically sealed line filter in plaintiff’s preproduction sample, the contract called for an open line filter and the Government did not authorize the additional work over contract requirements.
*104 29. I.F. chassis assembly. Plaintiff completely redrew the ABF drawing SC-B-72886, I.F. chassis assembly, expanding the furnished drawing into two pages by giving additional views of the assembly, providing a complete wire table to instruct production line workers where to connect the wires, and expanding the notes substantially. The positioning of the components in the assembly was critical and required detailed illustration which was not provided in the furnished drawing. The furnished drawing properly reflected the model but in insufficient detail for manufacturing purposes. It is concluded that the work performed by plaintiff on this drawing was within the terms of Modification 3, for which an equitable adjustment was paid to and accepted by the plaintiff.
30. Assembly coil. Plaintiff revised ABF drawing, SCB-72907, assembly coil #5, to correct a mistake as to the microhenry rating (64 instead of 6.2, a mistake which recurred in several other ABF drawings of coils used in the generator), and to add a production note as to the method of winding the induction coil, and to code the drawings of each of two coils with colored dots to distinguish them. These corrections and additions consumed time in performing necessary tests to ascertain the errors and supply the omissions.
31. Coil and one switch mounting assembly. Plaintiff revised ABF drawing SC-C-72912, coil and one switch wiring assembly, by redrafting it on two sheets in greater detail showing the wiring procedure in sufficient clarity for assembly line purposes. Plaintiff also added a wiring table and wiring notes so an operator would know where the wires were to be connected, and added two leads not specified in the furnished drawing. The work done was to amplify the furnished drawing rather than correct errors and to make it usable by production line workers for manufacturing purposes.
32. Calibrator chassis assembly. Plaintiff extensively revised ABF drawing SC-C-72996, calibrator chassis assembly, to provide wiring information missing entirely from the furnished drawing, to spell out electrical components not mentioned, to add schematic information, provide a view of the underneath portion of the chassis, and add assembly in *105 formation. Without the revisions the furnished drawing would not have provided sufficient information to assembly line workers for manufacturing purposes.
33. Housing. Plaintiff revised ARF drawing SC-B-73016, housing, to correct certain representations in conflict with the model. For example, the shape of certain prongs or ribs in the model was tapered, whereas the furnished drawing showed them as not tapered. A new view was added to specify certain dimensions. Marks were added to denote required finish of certain surfaces, which was not noted on the furnished drawing. Erroneous dimensions were corrected, including a critical dimension involving the fit of a bearing into a counterbore, and other dimensions controlling the position of the counterbore to the center shaft and related gears which had to mate properly. As to the tapered prongs referred to above, the drawing finally approved by the defendant showed the prongs as not tapered, indicating that for some undisclosed reason the Government decided not to follow the model in this respect. There is no indication as to whether the specifications required either or neither, and they probably were silent on the point.
34. B.F. coil, Band “2?”, assembly. Plaintiff revised ARF drawing SC-B-73026, R.F. coil, Band “B”, assembly, to correct an inductance reading from 1.40 millihenry’s to 1.14 millihenry’s, and to change a Q measurement of 117 to a correct measurement of 210. Plaintiff’s revised drawing also supplied information not contained in the furnished drawing as to coil test data. The furnished drawing did not correspond to the model. The corrected information and new data were based on tests made by plaintiff.
35. Attenuator assembly. Plaintiff revised ARF drawing, SC-C-73036, attenuator assembly, to provide an additional view showing two dimensions important to the pickup loop, and to add a shaft to another view not shown on the furnished drawing. Two washers were added to the material list. The unit could not have been manufactured without a drawing containing the additional information in plaintiff’s revision.
36. Rivet. Plaintiff’s drawing, SM-B-166890, depicts a rivet, really a nut assembly, of which 14 are used to fasten *106 a shield onto the chassis. No furnished drawing depicted the details of the rivet and, since it proved not to be commercially available, plaintiff had to prepare a drawing so that the rivet could be fabricated.
37. Generator schematic diagram. The plaintiff’s revision of AEF drawing, SC-D-72531, generator, schematic diagram, is slightly different than the furnished drawing due to authorized changes or errors, but the evidence is not sufficient to reach any conclusions.
38. Wire diagram, chassis assembly. Plaintiff changed AEF drawing, SC-E-169159, wire diagram, chassis assembly, by adding a comprehensive wiring list showing exactly where the wires from the harness are connected to the various tube sockets, terminal boards and other components. This information was necessary for manufacturing purposes.
39. Wire diagram, front panel assembly. Plaintiff’s drawing, SM-E-169160, wire diagram front panel assembly; shows how the wires from the harness are connected to all other components in the assembly, such as meter terminals, potentiometer, line filter, etc. No comparable drawing was furnished by the Government, but the information on the drawing was obtained from the basic schematic diagram of the entire signal generator (see finding 37, supra). Thus, it was produced by the plaintiff as a manufacturing aid rather than to reconcile a conflict between the model, specifications, and furnished drawings. There is no showing that it was required by the Government, and so it is concluded that it was another example of plaintiff’s conscientious performance effort.
40. Wire diagram, B.F. box assembly. Although there was no conflict between the AEF drawing, SC-E-169161, wire diagram E.F. box assembly, and the model or specifications, the plaintiff revised the drawing to show omitted wiring information necessary for manufacturing, so that assembly line workers would have numbered leads and would know where the wires from the harness would coimect with other components.
41. I.F. Attenuator assembly. Plaintiff revised AEF drawing, SC-D-72798, I.F. attenuator assembly, to show seven views of the assembly and a schematic diagram instead *107 of tbe three views in the furnished drawing. The furnished drawing failed to show how the resistors were installed, or how the input wires were connected and terminated, which information the plaintiff’s revised drawing supplied. Plaintiff encountered a difficult engineering problem in that it had to handfit each resistor carefully, and even though it used the resistors called for in the specifications there was no assurance that they would function in combination as required. This problem was one which might well have been made the subject of a development contract to devise a proper solution. The furnished drawing was not adequate for manufacturing purposes, and was not “realistic”, a term which better fits plaintiff’s revision. On April 26, 1957, plaintiff requested reimbursement of $31,228.20 for engineering and material costs, which on May 29, 1957, the contracting officer disallowed on the grounds that resistor selectivity is required in fabrication of attenuators, and the work performed by plaintiff was not over and above contract requirements.
42. Oscillator tube. The specifications prescribed output performance standards for the high frequency oscillator tube. Using the same 6J6W high frequency oscillator tubes contained in the model and in the drawing, the plaintiff found that each such tube passed the JAN specification but caused modulation difficulties and/or did not have sufficient output at the 100 megacycle end of the generator to permit its proper operation. Only one out of every five to ten such tubes installed in the unit would work properly. The problem, which AI1F had also encountered in its contract performance, was found after thorough investigation to he attributable to a faulty circuit design which did not allow for tubes toward the low end of the specification range. The possibility of a separate contract to research the problem did not materialize. On April 26, 1957, the plaintiff claimed $2,247.50 for extra expenses incurred for labor, material and engineering in studying the problem. On May 29, 1957, the contracting-officer rejected the claim with an explanation that is not understood. There is nothing else in the record to refute the plaintiff’s statement of facts.
43. Waterproof transit case. The specification required the case of the signal generator to pass prescribed water im *108 mersion tests without leaking. The Government-supplied model had a cork gasket sealing the cover of the transit case. By testing plaintiff found that a case made in accordance with the model and the drawing leaked, and corrected the defect by substituting a rubber gasket and redesigning the top lip of the transit case cover, necessitating correction of the drawing to conform to the change. By letter of April 26, 1957, the plaintiff claimed $1,685 in engineering and extra material costs incurred. In his decision of May 29, 1957, denying the claim the contracting officer ruled that the work performed in meeting the immersion requirements of the stipulation was done under the contract. Such denial was erroneous since it was based on a performance specification which merely prescribes the desired end result but does not spell out the manner of its accomplishment.
44. General conclusions as to Modification 3. If the condition of the ABF drawings analyzed in findings 20 through 43 typified the condition of all other ABF drawings furnished by the Government to the plaintiff for revision under Modification 3, it would be concluded that the furnished drawings were substantially deficient on the whole and imposed a greater burden of revision and engineering research on plaintiff than the parties reasonably contemplated. It would be natural to suppose that the drawings selected by plaintiff for trial purposes averaged greater deficiencies than the others. The plaintiff’s evidence was that it had over 1,000 changes to make hi over 600 ABF drawings, and that only a relatively few required no change. It would have been impractical to consider evidence on each of the over 600 ABF drawings. It is concluded that the ABF drawings were, on the whole, inaccurate, incomplete, and misleading to plaintiff, but that the Government did not know their condition at the time and did not represent them to be other than they were. Many of the plaintiff’s revisions to the drawings were not to correct errors but were to supply omissions in both the drawings and the equipment itself which the Government, or a less conscientious contractor than the plaintiff, may not have felt compelled to make under the requirements of Modification 3. However, of the 21 representative drawings con *109 sidered in detail in the previous findings, more than 50 percent showed revisions necessary to correct basic errors. The drawings as ultimately revised and delivered by plaintiff were greatly improved over the AEF drawings, and supplied detailed data and information which the plaintiff or succeeed-ing manufacturers of the signal generator would have found adequate for manufacturing purposes, whereas the ABF drawings were inadequate for manufacturing purposes. The actual extent of revisions to the AEF drawings and improvement of the equipment was not anticipated by plaintiff and caused it substantial delays in contract performance, and research engineering costs, for which the equitable adjustment ultimately paid under Modifications 3 and 17 (findings 45 and 46, infra), provided no reimbursement. However, as to such damages Modification 8 provided in part as follows:
The responsibility for assuring that the drawings have been corrected will be the contractor’s, and the Government will not be responsible for damages or extra costs as a result of inaccuracies or omissions in the corrected drawings.
45. General disallowance of delay claims. On April 26, 1957, plaintiff filed a detailed claim with the contracting officer, in one section of which it alleged that the delays it had met had postponed its production period from November 1955-August 1956 to August 1956-May 1957, in the course of which time increases in materials and labor rates added 5 percent to the anticipated costs of production. On May 29, 1957, the contracting officer ruled that increased labor and material costs due to delays are not recoverable under the Changes Article of the contract, and that the contracting officer had no authority to increase the contract consideration for incidental costs arising out of delays resulting from a change.
46. Billing a/nd payment wnder Modification 3. On May 21,1958, the plaintiff billed the contracting officer for $129,-077 for work performed under Modification 3. A subsequent itemization of plaintiff’s claim was not acceptable. On August 11,1958, the plaintiff resubmitted its claim under Modification 3 in the reduced amount of $73,873. This revised
*110 submission eliminated from the original claim “costs arising from delays incurred as a result of rescheduling production to make the equipment conform to the revised model and revised drawings as required by Amendment No. 3.” The delay claims were not waived. As a result of conferences between the parties, on September 26,1958, the plaintiff resubmitted its claim under Modification 3 in the still further reduced amount of $64,463. Ultimately the parties agreed on a figure of $60,746 as an equitable adjustment for work performed under Modification 3, and on January 7, 1959, the parties ratified their understanding by signing Modification 17. Pursuant to this the plaintiff was paid $60,746 on March 19, 1959, after having delivered a complete set of accepted production drawings to defendant in January 1959. It is reasonable to conclude that the payment received by plaintiff under Modifications 3 and 17 did not include damages for claimed delays. Nor did it include the research engineering expenses. The plaintiff has filed a schedule of unreim-bursed damages totaling $61,993.
47. Dismissal of A8B0A appeal. On June 17, 1958, the Armed Services Board of Contract Appeals, after having received at hearing the plaintiff’s evidence and part of the Government’s, granted the latter’s motion to dismiss the appeal on the grounds of lack of jurisdiction, in that no contract provision provided a remedy for plaintiff’s cause of action.
Congressional Reference
48. Jurisdiction to enter judgment. The petition in this case was filed pursuant to House Resolution 451, 86th Congress, directing the court pursuant to sections 1492 and 2509 of title 28, United States Code, to report expeditiously to the United States House of Representatives the facts of the claim sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity and the amounts thereof found legally or equitably due. The claim appears to be one within the general jurisdiction of the court. It is therefore one on which, under section 1492 of title 28, United States Code, the court may render judgment.
*111 CONCLUSION OF LAW
Upon the foregoing findings of fact which, are made a part of the judgment herein, the court concludes as a matter of law that the third-party plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c).

 ARF previously was the contractor on a research and development contract with defendant relating to the development of the signal generator.

 “Manufacturer’s own drawings” are substantially different from production drawings in that they are less formal and not necessarily as accurate or complete as production drawings, since they primarily servo the internal needs of the particular contractor, as opposed to other potential contractors. For example, manufacturer’s own drawings may be mere sketches instead of finished production drawings, which latter permit any competent manufacturers to produce according to specifications. Vandykes are copies of drawings made on translucent paper with heavy ink.

 TAR, an abbreviation for Technical Action Request, is a formal request initiated by the contractor for Government approval for a- deviation from contract requirements or a change in specifications.

 Defendant’s warning to plaintiff of possible inaccuracies at tbe time of delivery of tbe ARE drawings just prior to tbe incorporation of Modification 3 to tbe contract, did not act to disclaim tbe warranty. This warning merely served notice to plaintiff tbat defendant bad not cheeked tbe ARE drawings. It did not inform plaintiff tbat tbe ARE drawings were inadequate for manufacturing purposes.

 Therefore, this report is confined to the separated issue of liability, although certain of the findings relate to the damage issue should it be reached eventually.