C. SANCHEZ AND SON, INCORPORATED, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 92–5010.

United States Court of Appeals, Federal Circuit.

Oct. 5, 1993.

Durward E. Timmons, Sherman & Howard, Colorado Springs, CO, for appellant. Of counsel was Robert S. Gardner.

Joan M. Bernott, Dept. of Justice, for appellee. With her on the brief were Stuart M. Gerson and David M. Cohen. Of counsel was Lisa H. Clay, U.S. Army Corps of Engineers.

Before NEWMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

PAULINE NEWMAN, Circuit Judge.

C. Sanchez and Son was awarded a fixed price contract with the United States Army Corps of Engineers in connection with the construction of an artificial battlefield at Fort Hunter Liggett, California. The contract required the installation of several electrical systems including interior wiring, an underground electrical distribution system, a telephone system, a lighting system and a lightning protection system, and included trenching and backfilling of ground in the course of installation of underground wiring. Sanchez subcontracted with I.C.G. Electric, Inc. to perform work on the project. Sanchez, on behalf of I.C.G., seeks equitable adjustments to compensate for certain increased costs. The United States Claims Court granted summary judgment against Sanchez on three claims.[1] We affirm as to two claims and reverse and remand as to one claim.

*Summary Judgment*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RUSCC 56(c)[2]. The moving party has the burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In response to a properly supported motion for summary judgment the opposing party "must set forth specific facts showing that there is a genuine issue for trial". RUSCC 56(f).

The evidence of the nonmoving party is to be believed, and all reasonable factual inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant. *Anderson*, 477 U.S. at 254–55, 106 S.Ct. at 2513–14. The grant of summary judgment is reviewed for correctness, *see Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987), the appellate court determining whether the matter was amenable to summary resolution and, if

---

1. *C. Sanchez and Son, Inc. v. United States*, 24 Cl.Ct. 14 (1991). The United States Claims Court has been redesignated the United States Court of Federal Claims. Federal Courts Administration Act of 1992, Pub.L. No. 102–572 § 902, 106 Stat. 4506, 4516. For clarity, we use in this opinion the name at the time of the court's decision.

2. The Rules of the United States Claims Court (RUSCC) generally follow the Federal Rules of Civil Procedure. RUSCC 56(c) is, in pertinent part, identical to Federal Rule 56(c).

so, whether the law was correctly applied to the facts.

## I

### Aluminum–Sheathed Cable

■ The contract specified the use of certain steel-sheathed cable for the data transmission line. The Okonite Company, as supplier, experienced delay in acquiring adequate quantities of the specified steel-sheathed cable, and proposed substituting, at no additional cost, aluminum-sheathed cable. Aluminum-sheathed cable is more expensive than steel-sheathed cable, and Sanchez described aluminum-sheathed cable as "superior". The Army rejected the requested substitution, stating that steel was superior in blocking magnetic interference on the data line.

Sanchez states that the Army conducted no investigation and cited no technical authority concerning the interference-blocking properties of aluminum versus steel, and that the Army's denial of this request without adequate technical review breached the duty to cooperate and not hinder the contractor's performance. As a result of this denial Sanchez experienced delay in the contract schedule, for which it seeks recompense.

■ The government must avoid actions that unreasonably cause delay or hindrance to contract performance. *Malone v. United States*, 849 F.2d 1441, 1445 (Fed.Cir.1988); *Lewis–Nicholson, Inc. v. United States*, 550 F.2d 26, 32, 213 Ct.Cl. 192 (1977); *George A. Fuller Co. v. United States*, 69 F.Supp. 409, 108 Ct.Cl. 70, 94 (1947). The Army promptly informed Sanchez of its view that the purpose of the requirement for steel-sheathed cable would not be met by aluminum. The record does not contain facts tending to show that the Army acted arbitrarily or unreasonably, or that aluminum-sheathed cable was known to have the requisite interference-blocking properties of steel-sheathed cable. Indeed Sanchez does not assert that aluminum is as effective as steel in this regard. The only statement of superiority in the record is that aluminum provides a superior hermetic seal, a property not asserted by Sanchez to be related to the property of blocking magnetic interference.

The burden of showing suitability for the intended purpose was upon Sanchez. Sanchez has not presented facts which, if established, would support entitlement to delay damages for the Army's refusal to accept the substitution of aluminum-sheathed cable. Summary judgment on this claim was correctly entered in favor of the government.

## II

### The Rollover Protective Structure

I.C.G. planned to use a Vermeer T–600D trenching machine to dig the trenches required by the contract, and the contract was bid accordingly. Not included in the bid was the cost of installing a rollover protective structure ("ROPS") on the trencher. After contract performance had begun, the Army directed I.C.G. to install a ROPS. I.C.G. objected but complied, and seeks recovery of the costs incurred. *See J.B. Williams Co. v. United States*, 450 F.2d 1379, 1394, 196 Ct. Cl. 491 (1971) (government directive to proceed beyond contractor's reasonable interpretation of contract was a constructive change and entitled contractor to an equitable adjustment).

I.C.G. explained that it did not believe a ROPS was required on the Vermeer T–600D trencher, because of the contract terms and because of its past experience using this trencher in government construction projects. I.C.G. referred to the absence of a requirement for a ROPS on trenchers in the Army Corps of Engineers Safety and Health Requirements Manual ("Safety Manual"), which was incorporated by reference into the contract. The Safety Manual does not mention trenchers in its section on requirements for rollover protection structures:

a. ... rollover protective structures (ROPS) shall be installed on crawler and rubber-tire tractors such as dozers, push and pull tractors, winch tractors, and mowers (except side boom pipe-laying equipment); off-the-highway self-propelled pneumatic-tire earth movers such as trucks, pans, scrapers, bottom dumps and end dumps; motor graders; water tank

trucks having a tank height less than the case; and other self-propelled construction equipment such as front-end loaders, backhoes, rollers, and compactors. ROPS are not required on trucks designed for hauling on public highways, crane-mounted, dragline backhoes, tractors or front-end loaders only when used to unload material from barges, sections of rollers and compactors of the tandem steel-wheeled and self-propelled pneumatic tired type that do not have an operator's station, self-propelled rubber-tired lawn and garden tractors under 20 drawbar horsepower, cranes, draglines, or equipment on which the operator's cab and boom rotate as a unit

. . . .

**b.** ROPS shall be installed in accordance with the manufacturer's or designer's recommendation. . . .

Safety Manual § 18.B.20.

■ A contract is read in accordance with its express terms and the plain meaning thereof. *Hol–Gar Mfg. Corp. v. United States,* 351 F.2d 972, 169 Ct.Cl. 384 (1965); *Hills Materials Co. v. Rice,* 982 F.2d 514, 516 (Fed.Cir.1992). When the matter in dispute is not expressly provided for in the contract, it is necessary to determine whether the contractor's interpretation of the contract requirements was reasonable. The Claims Court, granting summary judgment in favor of the government, stated that the Safety Manual was "unambiguous" in requiring ROPS on trenchers. The court stated that although trenchers are not specifically mentioned in the Safety Manual, the Manual requires ROPS on "crawler and rubber-tire tractors such as dozers" and certain "other self-propelled construction equipment". The court held that trenchers are like crawler tractors.

Sanchez' position is that a "trencher" is a specifically defined class of construction vehicle, is not a "crawler tractor" or a "dozer", and is not similar to any of the equipment the Safety Manual lists to illustrate "other self-propelled construction equipment". Sanchez states that an experienced engineer would understand that these classes of vehicle have well-recognized meanings, and would so read the Safety Manual. Sanchez

provided the affidavit of Mr. Brand, the Product Safety Manager for Vermeer Manufacturing Co., who averred that based on the standards and definitions of the Society of Automotive Engineers and his own extensive experience, a trencher is not a crawler tractor or a dozer, and is not like a crawler tractor or a dozer. He stated that the Vermeer trencher model T–600D has a boom which in operation extends down into the ground thereby preventing rollover, that the machine has a low center of gravity and wide track base making it very stable, and that the operator is side-mounted which provides a quick and virtually unhindered egress. Mr. Brand averred that neither Vermeer nor any other manufacturer of similar trenchers included factory-installed ROPS on such trenchers, and that Vermeer had sold T–600D trenchers to both the Air Force and the Navy without any requirement for installation of a ROPS.

Mr. Gilbreth, the President of I.C.G., averred that of the equipment listed in the Safety Manual, the Vermeer T–600D trencher most closely resembled side boom pipe-laying equipment, which was specifically excepted from the ROPS requirement. Mr. Gilbreth stated that the boom of a T–600D trencher provides considerably more protection from rollover than a pipe-laying boom. He also stated that in over fifteen years of experience he had never been required to install a ROPS on a T–600D or similar trencher, that it was industry practice not to install a ROPS on such trenchers, and that the manufacturer did not recommend the use of ROPS on these trenchers.

The government responded that the Vermeer manufacturer's manual for the T–600D trencher employs the term "tractor" in its description of the trencher, and also cautions against rollover when using trenchers on steep slopes. The government pointed out that the terrain in this case included steep slopes, and states that it was reasonable for the Army to read the Manual as requiring ROPS on trenchers.

■ We agree with Sanchez that an incorrect legal standard was applied by the Claims Court. The question to be asked was

whether the contractor's reading of the Safety Manual was reasonable. If it was, the post-award requirement that a ROPS be installed may properly be viewed as a constructive change, whether or not the Army's requirement for a ROPS was reasonable. "Where the Government draws specifications which are fairly susceptible of a certain construction and the contractor actually and reasonably so construes them, justice and equity require that that construction be adopted." *Peter Kiewit Sons' Co. v. United States,* 109 Ct.Cl. 390, 418, 1947 WL 5089 (1947). If the contract was reasonably read by Sanchez, and the contract was not sufficiently ambiguous or unclear as to place a duty of inquiry on Sanchez before the contract was bid and the award made, the cost of a later and more expensive reading by the government can not fairly be imposed upon the contractor. *See Hills Materials Co.,* 982 F.2d at 516 (contractor's reasonable interpretation of latently ambiguous provision adopted even where government's interpretation was also reasonable). The law requires, as between government and contractor, the fair allocation of post-award changes in the costs and burdens of performance. *See Nager Elec. Co. v. United States,* 442 F.2d 936, 946, 194 Ct.Cl. 835 (1971) (equitable adjustments, whether in favor of contractor or government, utilized to keep parties whole in light of contract modifications); *Electronic & Missile Facilities, Inc. v. United States,* 416 F.2d 1345, 1358, 189 Ct.Cl. 237 (1969) (increased costs incurred as a result of modification are to be fairly compensated through equitable adjustment); *Bruce Construction Corp. v. United States,* 324 F.2d 516, 518, 163 Ct.Cl. 97 (1963) (equitable adjustments utilized to keep contractor whole when government modifications increased performance costs).

■■■ The interpretation of a contract term is a question of law. If a contract is determined, as a matter of law, to be ambiguous, and evidence is required to cure the ambiguity, facts found from such evidence are reviewed for clear error, whereas the contract interpretation based thereon is reviewed *de novo* on appeal. *See George Hyman Construction Co. v. United States,* 832 F.2d 574, 579 (Fed.Cir.1987); *B.D. Click Co. v. United States,* 614 F.2d 748, 752, 222

Ct.Cl. 290, 297 (1980). However, when the matter was decided on motion for summary judgment, the nonmovant's version of the underlying facts must be believed, and judgment can not be sustained in favor of the movant unless there is no version of the facts that could support a contract interpretation in favor of the nonmovant. *See Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. at 2511.

The question before the Claims Court was not to decide the better reading of the contract, or whether the Army's post-award reading was reasonable. The question was whether Sanchez' reading was reasonable, for it was on the basis of Sanchez' reading that the contract was bid. The government offered no testimony to counter that of Sanchez' affiants. There is merit to Sanchez' argument that the omission of trenchers from the lengthy list in the Safety Manual evokes the rule of *ejusdem generis.* As a minimum, the specific listing in the Safety Manual of a number of included machines, and the specific listing of a number of excluded machines, establishes no presumption that machines not mentioned are nonetheless included. Further, Sanchez produced evidence tending to establish that the words "tractor", "crawler tractor", and "dozer" are words having specific meanings, citing the definitions of the Society of Automotive Engineers; there was no contradiction to the expert opinion that none of these words was used or understood to include trenchers.

■■■ We conclude that the Claims Court incorrectly described the contract as "unambiguous". A contract term is unambiguous if there is only one reasonable interpretation. Although a disagreement as to the meaning of a contract term does not of itself render the term ambiguous, *Blake Construction Co. v. United States,* 597 F.2d 1357, 1359 n. 16, 220 Ct.Cl. 56 (1979), if more than one meaning is reasonably consistent with the contract language it can not be deemed unambiguous. *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed.Cir. 1986); *Hills Materials Co.,* 982 F.2d at 516. The record shows a genuine factual dispute as to how the Safety Manual listing would reasonably be read by engineers and experts

in the field. This fact is material to the determination of whether the contractor acted reasonably in not including the cost of a ROPS in its bid price.

Thus summary judgment on this claim was inappropriately granted. The summary judgment is vacated. On remand the trial court shall determine whether the contractor acted reasonably in its interpretation of the contract provision with respect to the ROPS. If it did, the directive to install a ROPS is properly treated as a constructive change. *See J.B. Williams Co.*, 450 F.2d at 1394 (directive to proceed beyond contractor's reasonable interpretation a constructive modification); *Hills Materials Co.*, 982 F.2d at 516 (adopting contractor's reasonable construction of ambiguous provision); *Peter Kiewit Sons' Co.*, 109 Ct.Cl. at 418 (contractor's reasonable interpretation of ambiguous language adopted to effect justice and equity).

## III

### *The Buy American Act*

The Buy American Act, 41 U.S.C. §§ 10a–10d ("BAA"), requires the government to give preference to domestic materials of construction. The implementing regulations define domestic materials as those wherein at least fifty percent of the component cost is of United States origin:

48 C.F.R. § 52.225–5(a). The Buy American Act (41 U.S.C. § 10) provides that the Government give preference to domestic construction material.

"Components", as used in this clause, means those articles, materials, and supplies incorporated directly into construction materials.

"Construction materials", as used in this clause, means articles, materials, and supplies brought to the construction site for incorporation into the building or work.

"Domestic construction material", as used in this clause, means ... (2) a construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components....

The Act provides for exceptions based on the relative cost of domestic and foreign materials. Thus the requirements of the BAA are subject to waiver if the head of the contracting agency determines that the purchase of domestic material is "inconsistent with the public interest" or that the cost is "unreasonable". 41 U.S.C. § 10d. Rules guiding such waiver determinations are contained in Executive Order No. 10,582, 3 C.F.R. § 230 (1954–58), *reprinted as amended in* 41 U.S.C. § 10d note (1982).

As stated in the Executive Order, the cost of domestic materials is deemed unreasonable or their use inconsistent with the public interest, for purposes of 41 U.S.C. § 10d, if their price exceeds the price of like materials of foreign origin plus six percent. Executive Order § 2(b), § 2(c)(1). Although the agency head is authorized to establish minimum price differentials greater than six percent, *see* Executive Order § 5, absent such departure the six percent criterion applies and its application is mandatory to the agency. *John C. Grimberg Co. v. United States*, 869 F.2d 1475, 1477 (Fed.Cir.1989).

Sanchez' bid was based on the price of certain wire and cable supplied by Houston Wire and Cable Co. and partly manufactured by Canada Wire and Cable Ltd. After contract award Sanchez requested approval from the Army to use this material, submitting a letter from I.C.G. stating its good faith belief that the wire and cable complied with the BAA because the components manufactured in the United States exceeded fifty percent of the total component cost and the final stages of fabrication would be performed by Houston Wire and Cable in the United States. Houston Wire and Cable also provided details of the components and manufacture of the cable. After apparently extensive correspondence the Army disapproved the proposed material for failure to qualify as domestic material under the BAA. This failure to qualify as domestic material is no longer disputed.

 The requisite domestic wire and cable was available from the Okonite Company. The affidavit of I.C.G's president records his statement to the Contracting Officer's Authorized Representative: "Bill, you're killing

me—the Okonite wire will cost me $100,000 more—isn't there anything you can do for us?" and the response "there's nothing I can do—you're going to have to use an American-made product, it doesn't matter which supplier you use." After completion of performance using the Okonite product Sanchez filed a claim for equitable adjustment.

Sanchez states that the Contracting Officer's Authorized Representative ("COAR") was required to process a request for waiver of the BAA on learning that the cost of domestic cable was over six percent more than the cost of the foreign-source cable, pointing to Executive Order § 2(b) which states that the use of domestic materials costing over six percent more than like foreign materials "shall be deemed to be unreasonable or the purchase of materials shall be deemed to be inconsistent with the public interest". Sanchez points out that the agency is charged with assuring compliance with the BAA, and states that the obligation to pursue a waiver arose in the conversation between I.C.G.'s president and the Contracting Officer's Authorized Representative, when the COAR was informed that a $100,000 price differential existed and I.C.G.'s president pled for relief.

The Claims Court held that Sanchez should have requested a waiver of the BAA before contract performance, and that since it did not do so, it is not now entitled to an equitable adjustment. The Claims Court rejected Sanchez' argument that the COAR misled it when asked if there was "anything you can do for us", holding that the information conveyed to the COAR was insufficiently detailed to constitute a waiver request.

Sanchez argues that it is the COAR's responsibility to administer the BAA, and that this administration includes not only assuring that domestic materials are used when available, but assuring that the requisite waiver is obtained when the cost differential is deemed unreasonable by statute and regulation. Since such a waiver must be approved by the agency head, the requisite information is submitted to the agency head by the agency's contracting authority, for contractors do not make direct submittals to the agency head:

48 C.F.R. § 25.203(b). When proposed awards are submitted to the agency head for approval, each submission shall include a description of the materials, including unit and quantity, estimated costs, location of the construction project, name and address of the proposed contractor, and a detailed justification of the impracticability of using domestic materials.

Sanchez states that § 25.203(b) reinforces the argument that it is the responsibility of the contracting officer to process a waiver request when the domestic price is deemed unreasonable under Executive Order § 2(b).

■ Administration of the BAA is the responsibility of the government. See FAR–1.602–1(b) (Contracting Officer to ensure compliance with all Executive Orders). The COAR offered no explanation of his negative response to the question asked by I.C.G.'s president of whether anything could be done. Indeed, the COAR by affidavit stated that he knew that waiver of the BAA was not impermissible after award of the contract. See Grimberg, 869 F.2d at 1477 (circumstances may warrant post-award waiver of BAA); John T. Brady & Co. v. United States, 693 F.2d 1380, 1384 (Fed.Cir.1982).

However, although the contractor did request post-award approval of the Canada Wire material based on the position that it complied with the BAA, the contractor made no formal request for waiver of the BAA, either before or after award. The remark of the COAR that nothing could be done, although subject to criticism, can not reasonably have been understood as the formal denial of a formal request for waiver of the BAA.

■ The appropriate time to request waiver of the BAA is in the first instance before contract award, and surely before the contract has been performed, so that the grant of a waiver, if such is warranted, will avoid the increased costs for which Sanchez now seeks recompense. We discern no clear error in the finding of the Claims Court that the contractor did not make a timely request for waiver of the BAA, and that the contractor is not entitled to an equitable adjustment based on the events surrounding the BAA. The ruling on this point is affirmed.

*Costs*

No costs.

*AFFIRMED IN PART, VACATED IN PART AND REMANDED.*