# United States Court of Federal Claims

No. 16-948 C
October 12, 2018

_____

**CKY INC.,**

   *Plaintiff,*

**v.**

**UNITED STATES OF AMERICA,**

   *Defendant.*

_____

*Daniel Lawrence Baxter*, *Esquire*, Wilke, Fleury, et al. Sacramento, CA, for plaintiff.

*Douglas Thomas Hoffman*, *Esquire*, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for defendant.

## ORDER AND OPINION

**HODGES, Senior Judge.**

Plaintiff CKY alleges that it suffered damages during the performance of a contract and seeks recovery of $4,528,676 from the United States. Defendant asserts that CKY's action is based on an unreasonable interpretation of the contract. The Government has filed a motion for summary judgment, a motion to dismiss count four of the Complaint, and a counterclaim for liquidated damages.

## BACKGROUND

The United States through its International Boundary and Water Commission (the "Commission") awarded a $6,399,900 small business set-aside construction contract to CKY in June of 2012. The Commission applies the boundary and water treaties between the United States and Mexico under the foreign policy guidance of the United States Department of State. The Commission is responsible for flood control in the border region, which involves maintenance on levees.

The purpose of the contract was to widen and "rehabilitate" the top surface of the Urban Presidio Levee in Presidio, Texas by excavating old embankment material and depositing new embankment material. CKY was required to "excavate into the existing levee to create a series of keys and benches as shown in the plans," then fill the benches with new embankment material.[1]

The contract required embankment material be tested to ensure that it met the material requirements before it was deposited on the levee. The embankment soil exposed by the excavation had to meet performance specifications, such as moisture content and compaction. After the approved embankment material was broadcast on the levee, it was tested again to ensure that each layer of the levee passed the contract's performance requirements.

CKY struggled to pass subgrade moisture and density tests, resulting in scheduling delays and requests for extended work hours. CKY alleges that government contracting officers directed the placement of suitable embankment material over "unacceptable, non-constructible subgrade." This was a modification of the contract, according to CKY, that constitutes an oral and implied-in-fact contract on which it relied "in exchange for compensation from the Commission for completion of said work."

Plaintiff filed a Complaint in August 2016, seeking more than $4,528,676 in damages. CKY alleges that the contract documents and additional materials incorporated therein misrepresented pertinent site conditions on the project. The actual site conditions on the project were not reasonably foreseeable, CKY contends, and that it incurred additional costs because the subgrade material in a levee that it would develop did not satisfy the embankment material specifications in the contract. The Complaint lists the following causes of action: (1) differing site conditions; (2) defective specifications; (3) constructive change; and (4) breach of an oral and implied-in-fact contract.

The Government filed a motion for summary judgment and a counterclaim in August 2017. After oral arguments, we deferred ruling on defendant's motions to allow CKY additional discovery.

**LEGAL STANDARDS**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A responding party may not merely deny that a fact is true or is genuinely disputed, but "must

---

[1] We observe the following explanation of construction terminology: "The rehabilitation of the levee . . . generally involved excavating into the existing levee material by cutting (or "grading," or "benching") steps (or "keys," or "benches") into the levee." (ECF No. 22 at 7, ¶ 2.)

support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . . affidavits or declarations . . . or other materials." RCFC 56(c)(1). The moving party "always bears the initial responsibility of informing the [court] of the basis for its motion" but the rule does not require "that the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). Alternatively, "the burden on the moving party may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case."

## DISCUSSION

The Government's contentions in support of summary judgment include: (1) a reasonable contractor could not have interpreted the contract in such a way as to expect the subgrade to meet the embankment specification; and (2) plaintiff gave inadequate notice of a differing site condition. The case turns on these two legal issues for which no material fact is in dispute, according to defendant.

The voluminous record of this case does not provide evidence sufficient to support CKY's claims that the Government is entitled to a judgment as a matter of law for the reasons below.

### I. The Government's Motion for Summary Judgment

The primary issue concerns the suitability of the levee subgrade. The Government asserts that the four counts of plaintiff's Complaint are based on CKY's unreasonable interpretation of the contract as it applies to the subgrade specifications, and that each count "rel[ies] on a very specific contract interpretation for the subgrade material as 'acceptable and constructible'"

### A. Reasonable Contract Interpretation

CKY claims that the omission of express subgrade material specifications meant that the subgrade soil was required to comply with all embankment material specifications. We cannot agree.

In general, "a contract is read in accordance with its express terms and the plain meaning thereof." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993). A court must "interpret the contract in a manner that gives meaning to all of its provisions and makes sense." *Mcabee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (1996). There must be "a reasonable meaning to all parts of an instrument," as opposed to "leav[ing] a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, or superfluous." *Hol-Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 395 (1965).

The Commission addressed embankment material specifications in pre-award communications as follows:

> Question: The geotechnical report does not have results for pinhole and crumb test results on existing levee. Will the existing levee meet the contract requirements for embankment? If not, how will this be handled on a day to day basis?
>
> Response: The existing levee was constructed with soil that met ASTM D4647ND1 or ND2 classification. Due to contamination in situ and the Contractor's excavation processes, [the Commission] cannot state that excavated material will meet these requirements. The Contractor is required to meet the embankment specification regardless of the source of the embankment material.

("Question 4" of Amendment A003.)

Additional feedback provided to all contractors during the bidding process makes clear that the Commission did not know how much, if any, of the existing or excavated materials would meet the specifications:

> Question: As the contractor is keying [excavating] into the existing levee per the designed benches; how will the benching soils be handled during construction? Can these soils be utilized with embankment if found to be suitable? Please clarify.
>
> Response: As the Contractor excavates the existing levee, this material can be stockpiled for disposal or later use. If the material meets the Contract specifications, it may be reused on the levee.

("Question 34" of Amendment A003.)

> Question: Does the Government have an estimate of what percentage of the embankment material removed during the construction of the benches will be suitable for re-use as new fill material?
>
> Response: No. The existing levee was built with soils classified as CL, CH, or SC with a plasticity index of 15 to 30, a maximum liquid limit of 45, Grade 1 on ASTM D6572, and ND1 or ND2 on ASTM D4647. However, due to possible in situ contamination or contamination during the excavation process, it is unknown if or how much of the existing embankment material will meet the Contract specifications for reuse.

("Question 28" of Amendment A003.)

> Question: Will removal and disposal of any unsatisfactory material from the existing levee embankment be paid as a separate item, as it is unknown how much material will be unsuitable for use in the new embankment?
>
> Response: No.

("Question 29" of Amendment A003.)

The contract further provides separate requirements for embankment materials during the levee excavation and reconstruction. Subgrade moisture and density specifications state that during the rebuilding phase of the levee: "[s]urfaces subjected to fill . . . shall be moisture-conditioned . . . to a minimum of ninety five percent (95%) of the maximum dry density . . ." The embankment material used to refill the excavated benches is distinct from the subgrade soil: "[t]he moisture content of the subgrade and select fill shall be maintained within the range of optimum moisture content. . ." (ECF No. 22 at 42 (citing A306 at ¶ 3.4 D).)

Indeed, the Commission later explained that the subgrade material had to meet the embankment specification requirements only if it is removed and then subsequently reused on the levee. A876-77.

CKY also contends that it reasonably relied on the Commission's geotechnical report that failed to disclose the actual materials encountered because "it was not possible for CKY to see underground prior to bidding . . . [t]herefore, CKY – and all other contractors – had to rely entirely on the contents of the Government-issued solicitation package." However, a contractor would not reasonably rely on a geotechnical report containing such disclaimers as these:

> The Contractor may request a copy of the geotechnical report . . . [t]he data and report are not intended as a representation or warranty of continuity of conditions between soil borings nor groundwater levels at dates and times other than the date and time when measured. The [Commission] will not be responsible for interpretations or conclusions drawn there by the Contractor. Additional test borings and other exploratory operations may be made by Contractor subsequent to award of the Contract at no additional cost to the [Commission].

(ECF No. 22 at 49 (citing A73, Specification 00.31.32).)

Other provisions of the contract explain that the results in the geotechnical report account for inconsistency in materials throughout the levee: "Drill, sample, and test results are an indication of the subsurface condition at the location of the boring and tests. Variations in subsurface condition may exist between boring and test locations." (ECF No. 22 at 49 (citing A296, 1.7 "Use of Subsurface Information").)

A reasonable contractor would not expect soil removed immediately adjacent to subgrade to meet levee embankment requirements. When all parts of the contract are assigned meaning and understood in their entirety, CKY's reliance on its own interpretation of the constructability and suitability of the subgrade material was unreasonable.

## B.  Notice of Differing Site Conditions

CKY argues that "constructive notice" is sufficient to bring a monetary claim for differing site conditions and a changes clause claim. However, defendant cites case law holding that "[c]onstructive notice can only exist where the Government is not prejudiced by the lack of written notice." *AAB Joint Venture v. United States*, 75 Fed. Cl. 414, 424 (2007).

Plaintiff was obligated to communicate with the Contracting Officer when or if it discovered that the subgrade conditions did not meet its expectations. Despite these contract requirements, CKY did not provide such notice.

Instead, CKY filed a request for equitable adjustment more than one year after it raised the subgrade issue. A848. Such a substantial delay prejudiced the Government because it "foreclose[d] less costly alternative solutions or avoidance of contractor claims." *AAB Joint Venture*, 75 Fed. Cl. at 424. Plaintiff's request for an equitable adjustment sought almost three-quarters of the contract price. Notably, because the contract allowed adjustments upon approval, the Government likely would have imposed a suspension of construction to evaluate reasonable alternatives before approving more than $4,500,000 of additional costs. For these reasons, the Government was prejudiced by the lack of proper notice.

## II. The Government's Counterclaim for Liquidated Damages

The Government's counterclaim seeks recovery of $424,125.00 pursuant to a liquidated damages clause in the contract. "When damages are uncertain or difficult to measure, a liquidated damages clause will be enforced as long as 'the amount stipulated for is not so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention, or oppression.'" *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed. Cir. 1996) (quoting *Wise v. United States*, 249 U.S. 361, 365 (1919)).

The date of substantial completion under the contract was August 29, 2014. This was 225 days after the agreed upon completion date, January 16, 2014. Plaintiff entered into the liquidated damages clause, and the contract provision for damages, approximately $1,885 per day, is fair and reasonable. Defendant is entitled to a judgment on its counterclaim in the amount of $424,125.

## CONCLUSION

Plaintiff did not inquire about, and apparently was unprepared for, the requirements of this contract. Defendant's Motion for Summary Judgment is **GRANTED**. Defendant's Motion to Dismiss Count Four moot and therefore **DENIED**. Defendant's counterclaim for liquidated damages is **GRANTED**. The Clerk of Court will enter judgment for the United States in the amount of $424,125.

**IT IS SO ORDERED.**

s/*Robert H. Hodges, Jr.*

Robert H. Hodges, Jr.
Judge